**Vera C. GADDIS, individually and as Personal Representative of the Estate of Charles E. Cauthen, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. CIV. A. 3:96–478–19.

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 3, 1997.

---

James Edward Bell, III, of Bell and Moore, Sumter, SC, for Plaintiff.

Terri Hearn Bailey and John Berkley Grimball, Assistant U.S. Attorneys, Columbia, SC, for Defendant.

### ORDER

SHEDD, District Judge.

This medical malpractice case involves the 1991 death of Charles E. Cauthen at the Dorn Veterans Administration Hospital in Columbia, South Carolina. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332, and the Federal Torts Claims Act, 28 U.S.C. § 1346(b)(1). Plaintiff in this case, Vera Gaddis (hereinafter "Gaddis"), filed a claim with the Veterans Administration alleging that the Veterans Administration's negligent care for her father, Charles E. Cauthen (hereinafter "Cauthen"), resulted in his death. This claim was denied by the Veterans Administration.[1] Subsequently, this case came before this Court for a bench trial beginning on September 22, 1997. Based upon the testimony and evidence presented over eight days of trial, the Court hereby makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### Background:

Cauthen was a World War II veteran, having served in the Pacific Theater. He was proud of his service to his country, and spoke proudly of his military service. Born in June, 1922, Cauthen lived most of his life in rural Lancaster County, South Carolina. Cauthen lived a simple life, by choice, and was well-known, and respected in his community. An independent man, Cauthen was happy and satisfied with his lifestyle. He was one of seven children, and all others survive him.

He married Ogla Vian Cauthen, and one child, Gaddis, was born of this marriage. During Gaddis' childhood, her mother became ill. Because of Mrs. Cauthen's illness, Cauthen served the role of both mother and father. Although Gaddis moved in with her maternal grandmother because of her mother's illness, Cauthen and Gaddis remained extremely close throughout her life, visiting several times a month and maintaining regular telephone contact.

Through the years, Gaddis remained the most important person in Cauthen's life. This special closeness between father and daughter was due, at least in part, to Gaddis' mother's periods of absence and her mother's ongoing medical problems. This special

---

1. In light of the facts presented at this trial, the Court has serious reservations about the credibility of the administrative process which rejected this claim.

closeness between Cauthen and Gaddis continued throughout his entire life.

Gaddis and her family have lived in the Charlotte, North Carolina area for many years. Gaddis lives approximately one hour's travel time from Cauthen's home in Lancaster County, South Carolina. Over the years, Cauthen would visit Gaddis and her family on a frequent and regular basis, often at least two times per month. In addition, Gaddis and her family would often visit Cauthen at his home in South Carolina. In addition to these frequent visits, they continued to maintain frequent and regular telephone contact. Cauthen was always present with Gaddis and her family for holidays and special occasions.

### Diagnosis and Treatment:

In late February, or early March of 1991, Cauthen developed hoarseness in his voice. At that time, Cauthen was a regular smoker, having smoked for many years. Cauthen's sister and Gaddis convinced Cauthen to see a doctor. Cauthen called the Lancaster County Veterans Affairs Office and obtained an appointment at the Dorn Veterans Administration Hospital (hereinafter "VA") in Columbia, South Carolina, for March 14, 1991. Cauthen had great faith in the VA Hospital and felt that, as a veteran, he was privileged to be able to go there. He relied upon their evaluation and judgment, and believed he would be taken care of at the VA.

On March 14th, Cauthen visited the VA Hospital, but received no evaluation of his throat. Although, in addition to his hoarseness, he related to them a history of smoking, there was no examination or evaluation at that time of Cauthen's throat. Only a chest X-ray was done. Cauthen was sent home without any evaluation of the cause of his hoarseness.

Cauthen's hoarseness continued. Although his family continued to be concerned about his hoarseness, Cauthen was hesitant to see another doctor. When Cauthen's hoarseness continued to worsen, Gaddis finally convinced him to have it checked by a private physician.

On May 3, 1991, Gaddis and Cauthen's sister took Cauthen to see his family physician, Dr. Furse. Upon learning of Cauthen's hoarseness, Dr. Furse immediately referred him to Dr. Brian Wilson, an ear, nose and throat specialist in Rock Hill, South Carolina.

Also on May 3, 1991, Dr. Wilson performed an indirect laryngoscopy with a flexible laryngoscope on Cauthen's throat. At that time, Dr. Wilson found a lesion on Cauthen's left vocal cord. Dr. Wilson then ordered that further tests be done, including a direct laryngoscopy and a CT scan, to determine the "stage" of the tumor in Cauthen's throat. Dr. Wilson's orders were to "rule out" a "T2N0M0" carcinoma in his throat.[2]

Dr. Wilson's diagnosis and instructions to rule out a T2 tumor were given because a physical examination of the throat may not be enough to determine the true extent of the tumor. An indirect laryngoscopy limits what can actually be seen of the vocal cords and larynx. A direct laryngoscopy gives a more complete view of the vocal cords and larynx. Moreover, even with a direct laryngoscopy, possible sub-mucosal (under the surface) tumor invasion into the surrounding tissue cannot be seen. Dr. Wilson's orders were to perform a CT scan of the area to properly stage the tumor. With a CT scan, or an MRI, any spread into the surrounding tissue might be seen. A physical exam, employing a direct or indirect laryngoscopy cannot fully show extensions beneath the surface of the vocal cords and into surrounding ar-

2. With regard to throat cancer, the following classifications, or "stages," are used: A T1 tumor is confined to the vocal cord with no extension off the vocal cord, and no impairment of motion of the cord. A T2 tumor extends off the visible vocal cord into other areas and may produce some impairment of motion. T3 and T4 tumors extend even further into the tissue surrounding the visible vocal cord. The difference between a T1, T2, T3, and a T4 tumor is of critical importance when choosing the method and extent of treatment. If the tumor is still confined to the vocal cords, then very localized radiation treatment or surgical removal will usually cure the cancer completely. If the cancer has spread off of the vocal cords, then localized radiation will not properly attack all of the cancer, leaving it free to continue spreading.

For example, the N0M0 classification of a tumor represents that the cancer has not metastasized and that there is no involvement of the nodes.

eas. The misdiagnosis, mis-staging, and under-treatment of a tumor can allow the cancer to spread, while appropriate treatment after a proper diagnosis almost always cures the cancer completely.[3]

On May 6, 1991, Cauthen went to Columbia in an attempt to be seen at the VA Hospital. After a great deal of difficulty,[4] Cauthen was admitted to the VA Hospital on May 8, by Dr. David McKee (hereinafter "Dr. McKee"), a contract physician at VA.

On May 9, a direct laryngoscopy and biopsy of Cauthen's left vocal cord was performed.[5] The results of the direct laryngoscopy and biopsy showed a cancerous tumor along the entire length of Cauthen's left vocal cord. Cauthen's tumor was staged as a T1 lesion.

Based upon the VA's diagnosis and staging of Cauthen's tumor, the VA's Tumor Board recommended a course of radiation therapy for Cauthen.[6] The course of radiation was performed for the VA at Richland Memorial Hospital, while Cauthen was still admitted at the VA. A small and localized radiation field was used. Cauthen's radiation treatment was completed on July 16, 1991. Cauthen was released from the VA on July 17, 1991.

Dr. McKee did not see Cauthen again during his entire course of radiation treatment, and did not once consult with the physicians at Richland Memorial Hospital who were performing the radiation treatment and monitoring.

On July 30, 1991, Cauthen returned to the VA Hospital with Gaddis for his first follow-up visit with Dr. McKee. At that visit, Cauthen's voice was hoarse. Dr. McKee simply looked down Cauthen's throat with a mirror and told Cauthen and Gaddis that there was no sign of cancer. Dr. McKee's medical notes indicate that the vocal cord looked clear. Cauthen and Gaddis left this visit

with high spirits, believing the cancer was cured.

Cauthen's hoarseness worsened. He returned to the VA Hospital on September 3, 1991, for his second follow-up visit with Dr. McKee. Again, Dr. McKee simply looked down Cauthen's throat with a mirror and told him that there was no sign of cancer. Dr. McKee's medical notes for this visit again indicate that the vocal cord looked clear.

After this, Cauthen's hoarseness continued to worsen. In addition, he began having soreness in his throat and pain in his ear. However, he was still eating and drinking well. On October 15, 1991, Cauthen returned to the VA Hospital for his third follow-up visit with Dr. McKee. Once again, Dr. McKee simply looked down Cauthen's throat with a mirror and told him that there was no sign of cancer. Dr. McKee's medical notes again indicate at this visit that the vocal cord looked clear, but noted for the first time since radiation therapy that there was some swelling, or edema, in the area. At no time during any of these follow-up visits did Dr. McKee perform a direct laryngoscopy, order further diagnostic tests, or examine Cauthen's outer neck for lumps or other signs of tumors. The Court finds incredible Dr. McKee's testimony that the now-noted edema was always present, but was noted by him here to change his notes, thereby avoiding the appearance of "rubber-stamping" his notes. This explanation is particularly unbelievable because edema noted for the first time here almost certainly indicated a recurrence, or persistence of cancer. At this stage in Cauthen's treatment, a doctor's failure to respond accordingly in light of a "new" edema would be, in essence, an admission of malpractice. The Court believes that faced with this alternative, Dr. McKee gave this story about not wanting to "rubber stamp" his notes. The Court finds Dr. McKee's testimony on this point wholly without merit.

---

3. All of the medical witnesses agreed that laryngeal cancer is one of the most curable of all cancers.

4. The VA's action toward Gaddis and Cauthen on this occasion were indifferent at best, and callous at worst.

5. A resident doctor ordered a CT scan of Cauthen's throat, but, in another example of what seems to be the level of medical care provided at the VA, this order resulted in a CT scan of Cauthen's head instead.

6. Dr. McKee did not attend the meeting of the Tumor Board.

Dr. McKee told Cauthen that there was no cancer and scheduled the next follow-up visit for January of 1992. Dr. McKee prescribed Tylenol for Cauthen's pain.

Shortly thereafter, Cauthen's condition grew considerably worse. His hoarseness worsened, his throat was very sore, he had a severe earache, he was coughing up phlegm, and could not eat or drink well. In addition, he developed dysphasia (difficulty in swallowing) and a large lump appeared on the side of his neck.

On November 5, 1991, Gaddis took Cauthen back to the VA Hospital to see Dr. McKee. Dr. McKee simply looked once again down Cauthen's throat and said that there was no sign of the cancer. Once again, Dr. McKee did not perform a direct laryngoscopy, did not order or perform a CT scan, and did not discuss with Cauthen the possibility that the hoarseness, pain, swelling, dysphasia, and lump could be a sign of the persistence of the tumor. Once again, Dr. McKee did not even examine the outside of Cauthen's throat for lumps or other signs of a tumor.

Gaddis then expressed concern about Cauthen's condition, the fact that he could not eat or drink, and about the large lump on the side of his throat. Dr. McKee explained it as simply a swollen lymph gland. At Gaddis's insistence, Dr. McKee finally agreed to admit Cauthen to the VA Hospital on that day, November 5th.

Dr. McKee's admission notes do not reflect any indication that Dr. McKee was concerned that Cauthen's cancer was persisting or recurring.[7] No tests or studies to detect the cancer, such as a direct laryngoscopy and biopsy or a CT scan, were ordered or performed. Only marginal steps were taken to rehydrate Cauthen. Even with clear orders for the administration of liquids and nutrition through intravenous lines, nurses failed to carry out the physicians' directives. On at least one occasion, when Cauthen pulled out his IV lines, the nurses simply left them out without taking any steps to keep them in. Cauthen was an adequate candidate for surgery during the period from approximately November 6th through November 8th, as confirmed by the VA's own witness, Dr. Barwick, a surgical resident who attended Cauthen.

Incredibly, in light of Cauthen's condition and the clear indications of the persistence of his laryngeal cancer, on November 7, 1991, the VA informed him that they were getting ready to send him home. Cauthen called Gaddis and informed her of this development. Gaddis called Cauthen's attending resident, Dr. Lynn Flowers, and asked him about such an apparent mistake. Dr. Flowers indicated that Cauthen was being sent home with orders to re-hydrate him and to receive guidance from a dietician regarding his eating habits. Dr. McKee had not seen Cauthen since he was first admitted.

On November 9, 1991, Dr. Flowers called Gaddis to ensure that she was coming to the VA to pick up Cauthen on that day, as the VA was preparing to release him. When Gaddis arrived, she found Cauthen curled up, lying in a urine-soaked bed. The urine stain on the bed sheet was brownish and drying around the edges, suggesting that Cauthen had been lying in the urine-soaked bed for some time. He had no IV tubes in his arm and was greatly disoriented. Gaddis' efforts to obtain nurse assistance were futile, and Gaddis had to clean up Cauthen herself.[8]

Finally, Dr. Flowers arrived and Gaddis explained the situation. The doctor tried to find a lighted instrument to look down Cauthen's throat but could not find one. Dr. Flowers was joined by another doctor, and the doctors finally looked down Cauthen's throat with a mirror. The doctors determined that there was a blockage in the throat. They then put Cauthen in the surgical intensive care unit because of bronchial spasms. Dr. McKee still had not seen Cauthen since he was admitted on November 5. In addition, there had still been no tests or studies done, such as a direct laryngoscopy

---

7. While the Government has tried to convince the Court that the doctors knew cancer recurrence was a possible diagnosis, that testimony is completely unpersuasive.

8. Gaddis, then 37 years old, had never seen her father naked and had never before had to assist her father in such a manner.

and biopsy or CT scan, to test for the persistence or recurrence of Cauthen's throat cancer.

In response to Cauthen's breathing difficulties, Dr. Flowers finally placed an endotracheal tube down Cauthen's throat on November 12. Cauthen was admitted by Dr. McKee for dehydration. However, Dr. McKee took no steps to address Cauthen's throat pain, his difficulty in swallowing, and the general critical and serious problems with his throat.

Cauthen remained in the surgical intensive care unit from November 9 until December 2, 1991. It was not until November 14, that Dr. McKee even saw Cauthen. On that day, a direct laryngoscopy was performed and it was determined that Cauthen's cancer had persisted and that he now had a tumor the size of a "golf ball" in his throat.[9] Dr. Flowers went with Gaddis to tell Cauthen that his cancer was still there. When told of the cancer, Cauthen cried.

During the next two weeks, more tests and scans were performed, many in an untimely manner. There was no urgency in the care of Cauthen. On November 29, 1991, a tracheostomy was performed on Cauthen to ensure his ability to breathe. Even though there was a slight rebound after November 29, Cauthen never recovered from the effects of sustained hypoxia.[10]

On December 2, 1991, despite Cauthen's obviously critical condition, he was removed from the intensive care unit to a room with no continual monitoring. Despite Cauthen's critical and dangerous condition, the hospital records reflect very long periods of time in which no VA medical personnel, either doctors or nurses, properly checked on Cauthen.

On December 10, 1991, the medical records reflect that the mucous which was coming from Cauthen's trach tube was increasing in flow and changing in color and character. On that morning, Cauthen's brother and sister-in-law came to visit him. The VA had Cauthen sitting up, tied to a chair with wrist straps and posey belts. Cauthen was disoriented, unresponsive, and coughing up large amounts of phlegm.

Between approximately 11:00 a.m. and 4:30 p.m., Cauthen's brother and sister-in-law tried in vain to get the VA nurses to help Cauthen. During that entire time, no one came into Cauthen's room. Hours later, Cauthen was found dead, still tied to the chair. He was sixty-nine years old.

The testimony and evidence in this case, especially the medical records, paint a dismal picture of neglect by the VA Hospital; especially during the last days leading up to Cauthen's death. There are only sparse records about the care, cleaning, and suctioning of Cauthen's trach tube. The sparse medical notes which are present during this time are often illegible. There are several shifts during those days for which no nursing notes are entered. Vital signs were often not checked or charted for long periods of times; often several shifts. There is often a failure to chart a record of Cauthen's breathing as ordered by the physicians. Cauthen's nurse-call button was often not within his reach when he was restrained. Many doctors' orders were never followed and many were followed only after several days had passed.

Dr. Hirst–Allen, a VA physician, performed an autopsy and determined that Cauthen's death was caused by his untreated and spreading laryngeal cancer, which led to infection and multiple organ failure, which led to the stoppage of his heart. The autopsy also revealed that the cancer was found to be

---

**9.** A CT scan was still not performed until the next day, November 15, 1991. Even then it seems that a CT scan of the throat was a mistake. The doctor's orders are for a CT scan of the chest, abdomen, and hips. Ironically in May a neck CT scan had been ordered but one of the head was done. *See*, note 4.

**10.** Dr. Spencer, a government pathologist, now disagrees with the VA autopsy and claims that Cauthen's death was caused by an independent and unrelated heart attack. However, all of the

Plaintiff's expert physicians concur with the VA's autopsy that Cauthen's untreated cancer led to sepsis, hypoxia, multiple organ failure, and his death. Although unwilling to go so far as to officially change his opinion, Dr. Spencer admitted that the full and complete facts of the case, when finally brought to his attention during cross examination, were surprising and that he would have liked to have known about them when forming his opinion.

large and localized, on both sides of the vocal cords without metastasis.

## CONCLUSIONS OF LAW

### Negligence:

There are literally dozens of breaches of the medical standard of care in this case. Many of these breaches are admitted by the VA's own witnesses. Many others are clearly proven from the evidence and testimony presented. Cauthen's death was directly caused by such neglect and error.

### Breach of the Standard of Care:

Cauthen's diagnosis and treatment can be separated into three time periods. First is the period from March, 1991 through his radiation treatment, ending on July 17, 1991. Second is the follow-up period which begins on July 17, 1991, and runs through November 5, 1991. Third is Cauthen's final period of hospitalization beginning on November 5, 1991 and ending with his death on December 10, 1991.

### Initial diagnosis and treatment:

Although the Court does not find it necessary to causally connect the treatment received during this period with Cauthen's death, it appears the VA breached the appropriate standard of care in several ways:

Dr. McKee never even saw Cauthen after the direct laryngoscopy on May 9th until the first post-radiation follow up visit on July 30, 1991. This includes the entire six week radiation treatment period.[11] Dr. McKee himself admitted that his own record keeping was not very good and that he failed to read all of the orders and progress notes of the residents, interns, medical students, and nurses who were attending Cauthen. Dr. McKee never consulted with the physician administering Cauthen's radiation treatment. Dr. Wells, the VA's own expert witness, testified that this fact was surprising to him.

### The follow-up period:

█ The second period of Cauthen's care, the follow up period from July 17 until November 5, 1991, is when the most crucial breaches of the standard of care occurred.

It is during this period that the signs of persistence of Cauthen's cancer were surfacing more and more clearly with each follow-up visit. Dr. McKee ignored these obvious signs, and missed several opportunities to diagnose and treat Cauthen's tumor with salvage surgery (surgical resection of the tumor); a step which, by everyone's account, would have saved Cauthen's life.

Initially, Dr. McKee erred during the follow-up period by failing to refer Cauthen back to the treating radiologist for a follow-up examination during the first six weeks following radiation therapy. The VA's own witness, Dr. Wells, testified that the standard of care required such a referral.

As discussed above in the findings of fact, Cauthen's symptoms worsened from one follow-up visit to the next. If the radiation therapy was successful, and reduced or eliminated the tumor located on the cord, then the hoarseness, pain, and swelling were indications that there was another reason for the symptoms, likely a recurrence or persistence of the tumor in the surrounding tissue. This was made clear by the testimony of the Plaintiff's physician witnesses as well as the VA's expert, Dr. Wells. This should have been a red flag to Dr. McKee.

It was a breach of the standard of care for Dr. McKee to have failed to at least inform Cauthen that there was a possibility that the tumor was persisting or recurring, and to have failed to give him further diagnostic and treatment options. There is absolutely no question that on October 15, 1991, when Cauthen's hoarseness continued to worsen, when Cauthen experienced pain, and when swelling was noted for the first time, Dr. McKee breached the medical standard of care when he failed to take further steps to properly evaluate and treat Cauthen. The testimony was uncontroverted that, had Dr. McKee discovered the persistence of the tumor at that time, Cauthen would have been able to undergo removal surgery and that it almost certainly would have been curative and saved his life.

11. Although Cauthen was diagnosed with laryngeal cancer on May 9, 1991, the VA delayed his treatment until May 30, 1991, twenty-one days later.

Dr. McKee testified that his notes on October 15, indicating the appearance of swelling for the first time, may not really have meant that. He testified that there may have been swelling during the past visits but that he did not like to "just rubber-stamp" his progress notes. He indicated that he might have added the note about swelling so that there was some variety in his notes. First, if Dr. McKee's practice really was as he stated, this was a breach of the standard of care according to VA witness Wells. In medical treatment, trends are of critical importance. As in Cauthen's case, if swelling appeared for the first time in October, this was a critical factor for monitoring Cauthen's condition.

Cauthen's November 5 visit to Dr. McKee almost had the same result as his previous follow-up visits. If Gaddis had not insisted, it is doubtful that McKee would have admitted Cauthen to the hospital. Once again, Dr. McKee did not even order or perform further diagnostic tests to investigate the cause of his problems (i.e., recurrence or persistence of the tumor), such as a direct laryngoscopy and biopsy or a CT scan. He simply stated that there was no sign of cancer and that the lump on Cauthen's neck was only a swollen lymph gland.

### The final hospitalization:

■ Cauthen's final hospitalization was one of continuing neglect and error containing many individual breaches of the standard of care. Among these areas were: The VA's failure to quickly diagnose, treat, and remove the growing tumor in Cauthen's throat; VA's failure to address Cauthen's immediate medical needs which caused his condition to deteriorate to a state in which removal surgery was inadvisable or impossible; VA's failure to discuss with Cauthen or Gaddis the options available to them, including the weighing of risks for waiting or performing the removal surgery in light of Cauthen's condition; and VA's failure to properly monitor, treat and care for Cauthen caused continued decline, distress, pain, suffering, and eventually death.

The many breaches of the standard of medical care during this final hospitalization, as listed in detail in the findings of fact, fall under one of the four general areas of breach listed above. It is noteworthy that many of the breaches were freely admitted by VA personnel or other VA witnesses.

VA nurse Ellastine Horne, herself, admitted at least fourteen breaches involved in Cauthen's care. In addition, many of the VA's physician witnesses, whether fact witnesses or expert witnesses, admitted several breaches and further admitted "surprise" when specifically questioned about details in the medical records which were evidence of negligent care.[12]

Dr. Flowers, the VA resident attending to the care of Cauthen, was, in many ways, typical of the VA's witnesses in this case. He attempted to respond with an unseemly willingness to defend the VA in this case. In so doing, he was often caught in an inconsistency. For instance, Dr. Flowers attempted to defend the VA's delay in action by testifying that it would have been nearly impossible for Cauthen to have been moved from surgical intensive care to have the CT scan of the neck performed. Yet, when confronted with the clear records in this case, he had to admit that he himself ordered several CT scans for other areas on several days while Cauthen was actually in surgical intensive care.

It is further evident from the testimony and evidence, that Cauthen's final weeks in the VA Hospital were filled with pain and suffering, both physical and emotional. He was, for the most part, placed and kept in a helpless state, tied to a chair, often without

12. On several occasions, the VA's expert witnesses began by giving opinions which defended Dr. McKee and the VA's actions, or in some other way defended the VA's case. However, upon cross examination, when all of the details of Cauthen's care were made clear to them, they expressed some surprise. Dr. Wells, the VA's ENT expert, even admitted that if some of the facts in the record were true, then that might affect his opinions; in his words: "all bets are off." Dr. Spencer, the VA's pathologist, who first testified that Cauthen's death was not the result of cancer but was the result of an independent heart attack, clearly indicated that he would have liked to have had more of the facts of the case in the formation of his opinions. These assertions by the VA's own witnesses lead this Court to seriously question some of the VA's expert's opinions based upon the strong suspicion that they had not been fully and fairly informed of all of the facts of the case before they were asked to give their opinions.

the ability to eat, drink, breathe properly, or use the bathroom. In addition, he suffered with the knowledge that his cancer was not cured as he had been earlier assured by Dr. McKee, and that he was probably going to die under the most painful and helpless conditions.[13] While his pain and suffering really began during the period from July through November, his physical and emotional pain and suffering was many times worse during his final hospitalization. During this final period, for example, pain medicine was ordered for him but never given.

## Causation:

■ The VA's own autopsy concluded that Cauthen's death was caused by his untreated and spreading laryngeal cancer, which led to infection and multiple organ failure, which led to the stoppage of his heart.[14]

It is clear that Cauthen died as a result of his untreated cancer and the negligence of the VA Hospital.[15]

There is no question that, at the very latest, on October 15, 1991, Dr. McKee missed an opportunity to save Cauthen's life.[16] On November 5, 1991, Dr. McKee also missed an opportunity to save Cauthen's life. Dr. McKee's failures on these two dates, as well as later failures, directly caused a death which would not have occurred otherwise. Testimony in this case put Cauthen's survival percentage at over 90% had salvage surgery been performed, as it should have, on or about October 15, 1991.

## Damages:

### Wrongful Death:

■ According to the statutory life expectancy tables, Cauthen would have had a life expectancy of 11.54 years. In addition is the fact that all of Cauthen's brothers and sisters are still alive, indicating a familial propensity towards longevity. Further, it is clear from the testimony and evidence in this trial that Cauthen could have expected love, care, and support from his family. Accordingly, this Court finds that Cauthen would have had a life expectancy of ten (10) years.

As discussed above, this Court is convinced that Gaddis and Cauthen enjoyed a close, loving relationship. Accordingly, this Court values the loss of society and companionship at $80,000.00 per year, for a total of $800,-000.00. For mental shock and suffering, this Court awards $75,000.00. For grief, sorrow, and wounded feelings, this Court awards $75,000.00. For funeral expenses, based upon evidence presented, this Court awards $3,526.65.

### Pain and Suffering of Cauthen:

■ Cauthen died a horrible death. He endured terrible pain and suffering while slowly suffocating to death. Although pain medication was ordered, none was given to help offset the terrible pain caused as Cauthen's cancer slowly ate away the cartilage and muscle of his throat and neck. In addition, Cauthen suffered a severe loss of dignity and pride. He was reduced to a helpless state, in diapers, unable to help himself or even communicate with his family.

Calculating from October 15, 1991, through his final, horrible hospitalization until his death on December 10, 1991, this Court awards $125,000.00 for the pain and suffering of Cauthen.

This Court, therefore enters a judgment against the Defendant and in favor of the Plaintiff in the total amount of $1,078,526.65. This Court has carefully awarded damages in accordance with the actual damages suffered by Cauthen and Gaddis, without adding any punitive component to this award.

**13.** The Court notes that Cauthen's desire, as recounted through testimony, to defeat his cancer, and the happiness expressed by him when he was told the cancer was defeated, were rivaled in intensity only by the dread which he was forced to endure due to the VA's negligence over the course of his illness.

**14.** It is interesting to note that the VA defends everything it did except the autopsy.

**15.** On the day of Cauthen's funeral, an individual from the VA called Gaddis's office to tell her that everything was all right with her father. The caller did not even know that Cauthen was dead.

**16.** It is probable that even as early as July 30, 1991, or September 3, 1991, Dr. McKee could and should have taken another course of action which would have saved Cauthen's life.